**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**


LEON "DANNY" DICK-FRIEDMAN,
by and through his mother,
LINDA FRIEDMAN,

                    Plaintiff,

vs.

                                    CIVIL CASE NO. 04-60047
                                    HON. MARIANNE O. BATTANI

BOARD OF EDUCATION OF WEST
BLOOMFIELD PUBLIC SCHOOLS and
SUSAN LIEBETREAU,

                    Defendants.

_____/


**OPINION AND ORDER DISMISSING COUNTS I & II OF PLAINTIFF'S COMPLAINT**

**I.     INTRODUCTION**

       This case arises under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400

*et seq*. ("IDEA"), and corresponding Michigan laws and rules.  Plaintiff, Linda Friedman, brings

this action for, and on behalf of, her cognitively impaired son, Danny.  Plaintiff alleges that

Defendants have violated the IDEA, Michigan's Mandatory Special Education Act ("MMSEA"),

MICH. COMP. LAWS ANN. § 380.1701 *et seq*., and the Equal Protection Clause of the Fourteenth

Amendment.  Defendants moved for separate trials for the review of the administrative decision

and Plaintiff's constitutional claim.  Plaintiff stipulated, and thus, the only issues currently before

the Court is whether the IEP developed by Defendants violated the IDEA and MMSEA.

Defendants are the Board of Education of West Bloomfield, Michigan ("Board") and Susan

Liebetreau, the Director of Special Services for the West Bloomfield School District.  Plaintiff

seeks to overturn the order of a State Review Officer ("SRO") in favor of the defendant School

System.  Plaintiff asserts that the School System failed to provide Danny with a "free and

appropriate public education" ("FAPE") in Danny's "least restrictive environment" ("LRE") and

that she is therefore entitled to reimbursement from the School System for the education that she

provided Danny at her own expense.

## II.    STATEMENT OF FACTS

### A.    Background Facts

Leon "Danny" Dick-Friedman was born on January 29, 1988, and diagnosed with a

condition commonly known as Down Syndrome shortly thereafter.  Because of his condition,

Danny is a "child with a disability" as defined in the IDEA.  20 U.S.C. § 1402(3); 34 C.F.R. §

300.7.  He lives with his mother in West Bloomfield, Michigan, and has received special

education supports and services in the West Bloomfield School District since shortly after his

birth.  Danny is eligible for special education services as a child who falls into the category of

"cognitively impaired," with a last measured IQ of 36.

Danny was fully included in general education classrooms in elementary school, with

supports, including modifying the curriculum as needed, providing a full-time paraprofessional

classroom aide, and weekly teacher consultant services to assist the general education teacher.

During that time, Danny made steady and continuous progress toward achieving his educational

goals and objectives and had no significant behavioral issues at school.

In April 2000, an Individualized Education Program ("IEP") team meeting was convened

to discuss Danny's transition into middle school.  The IEP recommended placement in a

2

segregated categorical classroom for students with cognitive impairments, with some general education electives. The IEPs developed for Danny during his time at Orchard Lake Middle School established how many hours Danny would spend in the general education setting and the categorical classroom. The amount of time spent in the general education setting, per the IEPs, ranged from a low of seven and a half in 2000, to seventeen in the January 2003, IEP.

At the IEP team meeting in January 2002, Ms. Friedman requested that Danny spend more time with his non-disabled peers in the general education setting. The District staff again recommended placement in the categorical classroom with increased time in general education electives. Actual time in the categorical classroom environment was to be 12.45-17 hours weekly, with 17.15-13 hours in the general education environment. Ms. Friedman signed in agreement. This was the last agreed-upon IEP.

During his time at Orchard Lake Middle School, Ms. Friedman felt that Danny regressed socially, academically, and in his speech and language skills. Ms. Friedman also believed that behavioral issues were encountered within the segregated classroom, while his behavior in the general education setting during the same period of time was generally very good. Ms. Friedman attributed this differential to the belief that Danny models the students around him, and therefore, learns more and interacts appropriately while in the general education setting.

Three IEP team meetings were held during the last school year in issue. In January, April, and June of 2003. All three IEPs proposed continued placement in the categorical classroom. Ms. Friedman did not agree to them. In an attempt to reach an agreeable curriculum and placement for Danny, the final Individualized Education Program Team ("IEPT") Meeting was held on June 11, 2003, by the West Bloomfield School District to develop an IEP for Danny

3

for the upcoming 2003-2004 school year.[1]  There was no dispute over Danny's special education

eligibility or the goals and objectives that were developed for him.  West Bloomfield School

District and Ms. Friedman agreed that Danny should spend some time in a regular education

classroom.  However, there was discussion over Ms. Friedman's request that Danny be "fully

included" in all general education classes.  The School District was of the opinion that

approximately half of his day should be spent in a special education categorical classroom,

where he would receive instruction in language arts, math, science, and social studies.  For the

balance of the day, Danny would attend select general education classes, principally for the

purpose of socialization.

At the time of the June 2003, IEPT meeting, Danny was reading at between a first and

second grade level, and his performance in both language and math was at a kindergarten or first

grade level.  Given these factors, and Ms. Friedman's continuing focus on addressing Danny's

academic needs, the June 11, 2003 IEPT team developed the following goals for Danny:

> Speech/Language Goals and Objectives
> Annual Goal: To improve overall clarity of speech, and to increase receptive and
> expressive vocabulary development.
> Pre-Vocational Goals and Objectives
> Annual Goal: Danny will increase his reading skills.
> As short-term objectives, the Team strategized that Danny would read 1-2 grade
> level books and answer comprehension questions, learn to phonetically sound out
> words, and use picture cues to answer who, what, where when and why questions.
> Basic Reading/Written Expression Goals and Objectives

---

[1] The participants at the meeting were: Linda Friedman; Ilene L. Tinman, Parent
Advocate; Sherry Thibodeau, School Psychologist; Katie Winkler, Parent Advocate; Michael
Abel, General Education Classroom Teacher; Arlene Gunsberg, Special Education Classroom
Teacher; Michelle Morgan, School Social Worker; Prof. J. Michael Peterson, Wayne State
University, (at the request of Ms. Friedman); Blake Prewitt, School Counselor; Cheryl Rives,
Speech Pathologist.

Annual Goal: Danny will increase his writing skills.
Included as short-term objectives were that Danny would fill out forms with personal information, write two simple sentences independently, and continue to maintain his penmanship skills.
Math Goals and Objectives
Annual Goal: Danny will increase his math skills.
The short-term objectives were that Danny would continue to work on identifying coins and their value, write numbers 1-150 independently, add using manipulatives, add and subtract one digit numbers, and correct his adding and subtraction using a calculator.
Miscellaneous Goals
Annual Goal:
1. Danny will use appropriate social greetings with peers/adults throughout the school environment.
2. Danny will be able to express the cause of his frustration within the school environment.
3. Danny will be able to problem solve appropriately.

The IEPT discussed educational placement options to address the goals and objectives that were developed for Danny.  The IEPT discussed full inclusion in general education, placement in the resource room, and in the categorical cognitive impaired classroom.  The IEP finalized by the IEPT, provided that Danny's educational program would consist of seventeen and one-half hours per week in a special education categorical classroom at West Bloomfield High School ("WBHS"), with the balance of the school week, approximately fifteen hours, spent attending general education classes.  The IEP called for Danny to spend his entire school day at WBHS.

Danny's mother disagreed with the placement decisions included in the IEP, seeking, instead, to have Danny "fully included" in general education classes and spend no time in the special education categorical classroom or the resource room.  Ms. Friedman expressed her desire for Danny to be fully included in the general education environment where he can socialize with non-disabled peers, and to learn and practice communication skills in a variety of

5

settings.  Ms. Friedman refused to sign the June 11, 2003, IEP.  Ms. Friedman enrolled Danny, part time, at the Jewish Academy of Metropolitan Detroit ("JAMD") for the 2003-04 school year.  Danny attended the JAMD for three days a week, three hours a day, for a prayer service and an introduction to the bible class.  After the attending class at the JAMD, Danny worked, off-site, with a tutor on specific academic subjects, before attending the remaining classes in the IEP at WBHS.  Danny has attended JAMD full-time since the 2003-04 school year.  Danny has attended a rabbinics elective, modern Hebrew I, and a community service class, as well as, directed study halls.[2]  Danny has not taken any core academic classes with his peers at the JAMD since his enrollment.

As a result of her disagreement with the June 11, 2003, IEP, Ms. Friedman requested a special education due process hearing pursuant to 20 U.S.C. § 1415 (f) and Rule 24 of the Michigan Revised Administrative Rules for Special Education.  On July 1, 2003, the Michigan Department of Education appointed Gregory J. Kocab, an attorney and trained hearing officer, to serve as the Local Hearing Officer ("LHO") for the proceeding.

**B.     Procedural History**

The due process hearing was held before the local hearing officer ("LHO") between September 30, 2003, and October 3, 2003.  The issues before the LHO were: whether the June 11, 2003, IEP that placed Danny in the special education classroom for the core academic

---

[2] Directed study halls are much like regular study halls with the exception that a teacher that teaches a particular subject is available to answer questions the students may have in that subject: e.g., in a directed math study hall, a math teacher presides, and students may bring any math related questions they have about their particular math class to be answered one-on-one by the study hall teacher.

subjects[3] provided Danny with a free appropriate public education in the least restrictive environment; whether the School System considered a continuum of placement options; whether any benefits Danny received by being taught those subjects in the general education setting were outweighed by the benefits received in the special education setting; and, whether Ms. Friedman was entitled to reimbursement for the costs of enrolling Danny at the JAMD.  After an exhaustive review of the testimony of a number of persons who attended the June 11, 2003, IEPT, as well as, expert witnesses brought in by Ms. Friedman who did not attend the IEPT meeting, the LHO concluded that the June 11, 2003, IEP was not procedurally defective, and offered Danny a free appropriate public education in the least restrictive environment.

Ms. Friedman pursued an administrative appeal to the Michigan Department of Education.  An appeal of the LHO's decision was timely filed on December 8, 2003, and was assigned to SRO Lynwood Beckman, an attorney and trained hearing officer.  On January 5, 2004, the SRO issued a preliminary ruling denying Plaintiff's request to submit additional evidence and addressing the LHO's decision that the issue regarding the District's failure to implement previous IEPs could not be heard.  Following an exchange of briefs, and a "plenary review" of the entire hearing record, the SRO issued an independent decision on February 2, 2004.  The SRO affirmed the decision of the local hearing officer.  Specifically, the SRO found that: Danny would not benefit academically from taking "core courses" utilizing the general education curriculum; that learning the core academic subjects in the special education classroom was the only way Danny could realistically have an opportunity to achieve the agreed upon, and unchallenged, goals set forth in the IEP; and, that any social benefits gained by

---

[3] I.e., math, science, language arts, and social studies.

7

attending core academic classes within the general education setting were outweighed by

Danny's inability to

achieve his goals in that setting, considering the other abilities Danny had to socialize with non-

disabled students in the general education setting in non-core academic classes.[4]

On March 5, 2004, Plaintiff commenced the instant proceedings by filing a complaint in

this Court, pursuant to 20 U.S.C. § 1415(i)(2).  Plaintiff initiated the instant action contending

that Defendant's violated the IDEA and MMSEA by not offering Danny a FAPE in the LRE, and

by failing to ensure that procedural safeguards were observed as required by state and federal

law.  A timely answer was filed and the entire administrative record was filed with the Court by

the Michigan Department of Education on August 17, 2004.  At the request of the Plaintiff, the

Court permitted supplementation of the administrative record by hearing limited additional

testimony on November 2, 2005.  The matter is now before this Court for a decision on the

merits.

## III.   STANDARD OF REVIEW

The IDEA contains procedural safeguards that allow parents to challenge their child's

IEP.  20 U.S.C. § 1415(b)(6).  Michigan maintains a two-tiered administrative review system for

such challenges.  First, parents are required to present their complaint to a LHO, who conducts a

due process hearing on the merits of the complaint.  20 U.S.C. § 1415(f); MICH. ADMIN. CODE r.

340.1724.[5]  Second, any party aggrieved by the LHO's decision can, within twenty-five days,

---

[4] E.g., choir and drama, which were classes that Danny excelled in.

[5] Under Michigan law, when a parent requests a due process hearing, the school district superintendent must forward a copy of the request to the Michigan Department of Education within one day after receipt of the request. MICH. ADMIN. CODE r. 340.1724.

file an appeal with a SRO.  20 U.S.C. § 1415(g); MICH. ADMIN. CODE r. 340.1724(6).  The SRO

assigned to the appeal can seek additional evidence if necessary, and must make "an independent

decision upon completion of such review."  20 U.S.C. § 1415(g); 34 C.F.R. 300.510(a)(iii) and

(iv).[6]  A decision made by the SRO on appeal is final.  20 U.S.C. § 1415(i)(1)(B); 24 C.F.R. §

300.510(d).

Under the IDEA, once an aggrieved party has exhausted these two administrative

remedies, he may "bring a civil action with respect to the complaint presented pursuant to this

section. . .  in a district court of the United States."  20 U.S.C. § 1415(i)(2)(A).[7]  The federal

court applies a "modified *de novo*" standard of review to the action.  Burilovich v. Bd. of Educ.

of Lincoln Consol. Schs., 208 F.3d 560, 565 (6th Cir. 2000).  In a state such as Michigan, which

has a two-tiered administrative process, it is the decision at the second tier, that of the SRO,

which the Court reviews.  Thomas v Cincinnati Bd. of Educ., 918 F2d 618, 624 (6th Cir. 1990).

In this case, that is the Decision of State Review Officer Lynwood E. Beekman, dated February

2, 2004.

There are two parts to a district court's inquiry in actions filed under the IDEA.  First, the

court must determine whether the state has complied with the procedural requirements of the

IDEA.  Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206 (1982).

_____

[6] The standard of review employed by the SRO is not deferential.  Indeed, "the fact that the statute contemplates that the appeals body will make an 'independent decision' suggests not that the appellate body should defer but that it should reach a decision based on its own evaluation of the evidence, 'independent' of the findings of the hearing officer."  Carlisle Area Sch. v. Scott By and Through Bess. P., 62 F.3d 520, 528 (3d Cir. 1995).

[7]A narrow exception to the exhaustion requirement exists where exhaustion would be futile or the child would be irreparably harmed.  Pardini v. Allegheney Intermediate Unit, 280 F.Supp. 2d 447, 457 (W.D. Pa. 2003).

Second, the court must decide whether the IEP developed through the IDEA's procedures is "reasonably calculated to enable the child to receive educational benefits." Id., at 206-07. In Michigan, in order to meet the IDEA's requirement of a FAPE, the educational plan must be designed to develop the "maximum potential" of a child. MICH. COMP. LAWS ANN. §§ 380.170(a), 380.1711(17)(a), 380.1751(1); see also Burilovich, 208 F.3d at 565. "If the procedural requirements of the IDEA are met, greater deference is to be afforded to the district's placement decision." Dong v. Bd. of Educ. of Rochester Cmty. Schs., 197 F.3d 793, 800 (6th Cir. 1999). "The burden of proof challenging an IEP is on the party seeking relief." Schaffer ex rel. Schaffer v. Weast, 126 S.Ct. 528, 537 (2005).

In conducting its review, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B). The Supreme Court has instructed the district courts to make an independent decision based on the preponderance of the evidence, while at the same time, giving "due weight" to the determinations made during the state administrative process. Rowley, 458 U.S. at 206. District courts must not "simply adopt the state administrative findings without an independent re-examination of the evidence." Doe v. Metro. Nashville Pub. Schs., 133 F.3d 384, 387 (6th Cir. 1998). However, the district courts cannot "substitute their own notions of sound educational policy for those of the school authorities which they review." Thomas, 918 F.2d at 624 (quoting Rowley, 458 U.S. at 206). "[A]dministrative findings in an IDEA case may be set aside only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based

10

on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or

both." Burilovich, 208 F.3d at 567.  The amount of weight due to administrative findings

depends on whether the finding is based on educational expertise.  McLaughlin v. Holt Pub. Sch.

Bd. of Educ., 320 F.3d 663, 669 (6th Cir. 2003).  "Less weight is due to an agency's

determinations on matters for which educational expertise is not relevant because a federal court

is just as well suited to evaluate the situation."  Id.  "More weight, however, is due to an

agency's determinations on matters for which educational expertise is relevant. " Id.

III.    **ANALYSIS**

    A.    **Free Appropriate Education in the Least Restrictive Environment**

The IDEA provides federal funds to help states educate disabled students.  See 20 U.S.C.

§ 1411.  The IDEA requires states that receive federal funds to ensure that "a free appropriate

public education (FAPE) is available to all children with disabilities residing in the State

between the ages of 3 and 21 . . . ."  20 U.S.C. § 1412(a)(1)(A).  The IDEA also directs school

districts receiving federal funding to "provide instruction that suits the child's needs as well as

related services to ensure that the child receives some educational benefit from instruction."

A.B. ex rel. D.B. v. Lawson, 354 F.3d 315, 319 (4th Cir. 2004) (citing 20 U.S.C. § 1401(8)).

To ensure that a disabled student receives a FAPE under the IDEA, a school district must

provide an Individualized Education Program (IEP) for each child.  20 U.S.C. § 1414(d)(1)(A).

A student's IEP must contain information regarding his current educational capacity, future

educational goals, and services and aids that will assist him in maximizing her academic

potential.  Id., MICH. COMP. LAWS ANN. §§ 380.170(a), 380.1711(17)(a), 380.1751(1).  The plan

is developed by the IEPT, which includes the child's parents, as well as, regular and special

11

education teachers. Id., at § 1414(d)(1)(B). "An IEP provides a free appropriate public

education if (1) the state has complied with the procedures set forth in the IDEA and (2) the IEP

developed through the procedures is reasonably calculated to enable the child to receive

educational benefits." Dong, 197 F.3d at 800. "The substantive requirement of the IDEA found

in the second part incorporates Michigan's higher standard requiring that the IEP be designed to

'develop the maximum potential' of the child." Id. "If these requirements are met, the State has

complied with the obligations imposed by Congress and the courts can require no more."

Rowley, 458 U.S. at 207.

The IDEA also contains a requirement that the IEP for a disabled child educate that child

in the "least restrictive environment":

> To the maximum extent appropriate, children with disabilities, including children
> in public or private institutions or other care facilities, are educated with children
> who are not disabled, and special classes, separate schooling, or other removal of
> children with disabilities from the regular educational environment occurs only
> when the nature or severity of the disability of a child is such that education in
> regular classes with the use of supplementary aids and services cannot be
> achieved satisfactorily.

20 U.S.C. § 1412(a)(5). The LRE mandate requires that a student with a disability be educated

with his non-disabled peers in a general education classroom if he can be successfully educated

in that environment and should only be removed from the general education classroom when he

cannot be successfully educated in the mainstream with needed supports.

This dispute arises out of an administrative process regarding Danny Friedman's

educational placement.[8] In the proceedings below, Plaintiff contended that the West Bloomfield

---

[8] Any claim included in the Complaint that was not part of the administrative proceedings
is not properly before the Court and will not be addressed.

School District was not in full compliance with the procedural requirements of the IDEA and MMSEA. These arguments were largely intertwined with Plaintiff's substantive challenge to the proposed combined general education/special education placement. It is Plaintiff's position that Danny was successfully educated in a general education classroom with supplemental aids and services during his elementary years. During his middle school years, Danny was placed in a segregated special education classroom for part of each day. Plaintiff contends that Danny was not successfully educated in the segregated classroom, which resulted in an increase in behavioral issues and a decline in academic progress, as compared to his more successful time in the general education classroom. Plaintiff contends that Defendants would not allow Danny to be fully included in general education at the High School, proposing that half of each day be spent in a segregated setting and refusing to provide appropriate supplemental aids and services to support him in the general education setting. Plaintiff asserts that Danny has been successfully included in general education classes at the JAMD since the 2003-04 school year.

### 1.   Alleged Procedural Violations

Plaintiff first asserts that Defendants failed to comply with all of the procedural safeguards proscribed in the IDEA to allow parents to challenge their child's IEP. 20 U.S.C. § 1415(b)(6). Plaintiff alleges that: the District refused to consider or offer full inclusion at the high school level with supplemental aides and services as a possibility on the continuum of placement options in violation of 34 C.F.R. § 300.551; the placement decision was not made by a group of persons, including the parents, knowledgeable about the child, the meaning of the evaluation data, and the placement options in violation of 34 C.F.R. § 300.552(a)(1); the IEPT failed to document reasons why less restrictive options were rejected in violation of MICH.

13

ADMIN. CODE r. 340.1721e(3)(e); the IEPT failed to give consideration to parental concerns for enhancing the education of the student in violation of 20 U.S.C. § 1414(d)(3)(A)(I); and, the IEPT failed to consider any potential harmful effects of the placement in violation of 34 C.F.R. § 300.552(d).

District courts reviewing IEP proposals, "should concern themselves with 'the process by which the IEP is produced, rather than the myriad of technical terms that must be included in the written document." Doe By and Through Doe v. Defendant I, 898 F.2d 1186, 1190 (6th Cir. 1990). Opportunity for participation by parents is also an important aspect." Renner v. Bd. of Educ. of Pub. Schs. of City of Ann Arbor, 185 F.3d 635, 642 (6th Cir. 1999) (quoting Doe v. Defendant I, 898 F.2d at 1188-89). The SRO correctly noted that in determining procedural compliance, the determinative question is whether there has been adequate parental involvement and participation in formulating an IEP. Doe v Defendant I, 898 F.2d at 1191. Mere technical violations do not provide a basis for invalidating an IEP. Dong, 197 F.3d at 799. "Adequate parental involvement and participation in formulating an IEP, not adherence to the laundry list of items" are the primary concern in requiring that procedures be strictly followed. Doe v. Defendant I, 898 F.2d at 1191.

First, the Court finds that the IEPT considered a continuum of placement options, gave consideration to parental concerns for enhancing the education of the student, and any potential harmful effects of the placement in accordance with 20 U.S.C. § 1414(d)(3)(A)(I) and 34 C.F.R. § 300.552(d). From the IEP form itself it is clear that Ms. Friedman's concerns were expressed and considered. In numerous instances, Ms. Friedman's desires were noted, including her desire that Danny be fully included in the general education curriculum with paraprofessional help and

14

that Danny's speech therapy take place within a group of non-disabled peers.  Moreover, the

testimony from the participants in the IEPT meeting in the due process hearing before the LHO,

establishes by a preponderance that IEP was developed over the course of an extensive meeting,

that a continuum of educational placements were discussed - including the general education

setting, the resource or technically impaired setting, and the categorical classroom - that the

IEPT panel gave consideration to parental concerns for enhancing Danny's education, and that

potential harmful effects were raised and considered.  June 11, 2003, IEP, H.T. Vol. 1, at 191,

213, 219-20, H.T. Vol. III, at 88-89, H.T. vol. IV, at 12-13, 88-89, 93-98.  Therefore the Court

finds that the June 11, 2003, IEP developed by the IEPT did not run afoul of the procedural

mandates found in 20 U.S.C. § 1414(d)(3)(A)(I) and 34 C.F.R. § 300.552(d).

Next, Title 34, § 300.344(a) of the Code of Federal Regulations, provides:

> The public agency shall ensure that the IEP team for each child with a disability
> includes--
> (1) The parents of the child;
> (2) At least one regular education teacher of the child (if the child is, or may be,
> participating in the regular education environment);
> (3) At least one special education teacher of the child, or if appropriate, at least
> one special education provider of the child;
> (4) A representative of the public agency who--
> (i) Is qualified to provide, or supervise the provision of, specially designed
> instruction to meet the unique needs of children with disabilities;
> (ii) Is knowledgeable about the general curriculum; and
> (iii) Is knowledgeable about the availability of resources of the public agency;
> (5) An individual who can interpret the instructional implications of evaluation
> results, who may be a member of the team described in paragraphs (a)(2) through
> (6) of this section;
> (6) At the discretion of the parent or the agency, other individuals who have
> knowledge or special expertise regarding the child, including related services
> personnel as appropriate; and
> (7) If appropriate, the child.

The Court finds that the IEPT, taken as a whole, did have adequate "background, experience,

and training" to assess Danny's condition and to formulate a program to meet his needs under both the federal and state statutes involved.  Renner, 185 F.3d at 644.  The IEPT consisted of a school psychologist, a general curriculum classroom teacher, a special education classroom teacher, a school social worker, a school counselor, and a speech pathologist, as well as, Ms. Friedman and two parent advocates that included a social worker and a professor from the Developmental Disability Institute at Wayne State University.  The Court concludes that the IEPT, aided by parental advocates and experts, constituted a group which could make appropriate placement decisions, including an IEP, and included "persons knowledgeable about the child, the meaning of the evaluation data, and the placement options."  34 C.F.R. § 300.533(a)(3).

Finally, the Court finds that the IEPT did fail to document reasons why less restrictive options were rejected.  However, after reviewing the extensive record, the Court finds that the preponderance of the evidence suggests that the reasons for not putting Danny in the general education curriculum for all his academic studies was discussed during the June 11, 2003, IEP meeting, and more importantly, that Ms. Friedman had more than adequate parental involvement in the development of that IEP.  As noted above, Ms. Friedman expressed her desire to have Danny fully included in the general education curriculum with paraprofessional help and that Danny's speech therapy not take place in a group of special needs children.  Therefore, the Court finds that the failure to write down the reasons why Danny was not fully included in all the general education curriculum was a technical violation, and not a basis for invalidating the IEP.

### 2.    Alleged Substantive Violations

Plaintiff next contends that the IEP in question denied Danny of a FAPE in the LRE

16

because the categorical classroom is not the LRE.  Plaintiff argues that the LRE for Danny is within the general education setting with the proper supports and services.  "[A]dministrative findings in an IDEA case may be set aside only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both."  Burilovich, 208 F.3d at 567.  Because the procedural requirements of the IDEA are met, greater deference will be afforded to the district's placement decision.  Dong, 197 F.3d at 800.

The Sixth Circuit has noted that two types of IDEA cases can arise: those involving a decision between two alternative methods of educating a disabled student and those involving a decision about the extent to which a disabled child should be educated alongside a non-disabled child.  Roncker on Behalf of Roncker v. Walter, 700 F.2d 1058, 1062 (6th Cir. 1983).  When "the dispute is simply one of methodology[,] . . . the Supreme Court has emphatically stated that such questions should be left to the states."  Id., at 1062 (citing Rowley, 458 U.S. at 206-07).  Because Plaintiff contends that Defendants have not only failed to adhere to the mandates of the IDEA and MMSEA, but have also ignored research and evidence regarding best educational practices and failing to provide Danny with an effective education that incorporates best educational practices, this case presents both an issue of methodology, and of the extent to which Danny should be mainstreamed.

> States and school districts should be afforded some discretion in determining what type of program is appropriate based on the individual needs of a disabled child.  See id. at 566 ("The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the [IDEA] to state and local educational agencies in cooperation with the parents or guardian of the child.").  In this case, numerous school officials testified that the categorical classroom placement was necessary based on [the child's] goals and needs and based on a comparison of

the teaching methodologies.

McLaughlin, 320 F.3d at 673.

> Michigan has chosen to enhance IDEA's requirements, heretofore discussed, by requiring that an IEP be "designed to develop the maximum potential" of the handicapped child.  MCLA §§ 380.1701(a), 380.1711(1)(a) and 380.1751(1).  "The term 'maximum potential' has not been well defined in Michigan law.  Further, the standard may be more precatory than mandatory; it does not necessarily require the best education possible."  Brimmer v. Traverse City Area Public Schools, 872 F.Supp. 447, 454 (W.D. Mich.1994).  Michigan standards, moreover, do not require "a model education, adopting the most sophisticated pedagogical methods without fiscal or geographic constraints. . . ."  Barwacz v. Mich. Dept. of Educ., 674 F.Supp. 1296, 1302 (W.D. Mich.1987).  Plaintiffs concede as much, and that the interpretation of the standard is left in the reasonable discretion of the state officials dependent upon the circumstances of the case.  See Brimmer, supra, at 454-55.

Renner, 185 F.3d at 645.  Thus, neither the IDEA or the MMSEA require "the furnishing of every special service necessary to maximize each handicapped child's potential."  Rowley, 458 U.S. at 199.  Therefore, to the extent Plaintiff complains that WBHS's failure to incorporate special services, or utilize special tools or methodologies was a violation of the IDEA and MMSEA, Plaintiff's claims fail.

Next, Plaintiff claims that Danny was not offered a FAPE in the LRE because the LRE for Danny is full inclusion in the general education setting with the proper supports and services.

"Parties challenging an IEP have the burden of proving by a preponderance of the evidence that the IEP devised by the school district is inappropriate."  Deal v Hamilton County Bd. of Educ., 392 F3d 840, 854 (6th Cir. 2004), Rowley, 458 U.S. 176, 206 (1982).  Under both the IDEA and the higher Michigan standards, the School System proposed an adequate and sufficient plan "reasonably calculated to enable the child to receive educational benefits," "to advance

appropriately toward attaining the annual goals," and offering to meet and develop the "maximum potential" of the child in light of his abilities and needs.  <u>Rowley</u>, 458 U.S. at 207, 20 U.S.C. § 1414(D)(1)(A)(i)(IV)(aa).

The Sixth Circuit has set forth three factors for determining when the mainstreaming requirement may be overcome: (1) whether the disabled student would benefit from inclusion from general education, (2) whether such benefits would be outweighed by benefits that are not provided in an inclusive setting, and (3) whether the disabled child disrupts the general education setting.  <u>See</u> <u>Roncker</u>, 700 F.2d at 1063, <u>Burilovich</u>, 208 F.3d at 567.  "The Act does not require mainstreaming in every case but its requirement that mainstreaming be provided to the *maximum* extent appropriate.  The proper inquiry is whether a proposed placement is appropriate under the Act."  <u>Roncker</u>, 700 F.2d at 1063 (emphasis in original, footnote omitted).

The IEP developed by WBHS called for Danny to spend approximately half the day in the general education setting and the other half, where he was to receive instruction in the core academic subjects, in the categorical classroom.  Because Defendants do not contend Danny would disrupt the general education setting, the Court must determine if Plaintiff has shown by a preponderance of the evidence that Danny would benefit from inclusion in the general education setting for the remainder of the day, or if the benefits received from inclusion in the general education setting for those subjects would be outweighed by benefits that are provided in the categorical classroom.

Plaintiff argues that the Court should reverse the findings and conclusions of both the SRO and LHO and find that any IEP developed for Danny that mandates placement in a categorical classroom, for any part of the day, is inappropriate.  Plaintiff contends that with

19

proper supports and services Danny can make "adequate yearly progress, including continuous and substantial academic improvement" in all regular high school academic subjects, and therefore should be placed full-time in the general education setting.  Pl.'s First Amended Compl., at para. 64.  The preponderance of the evidence, however, does not support Plaintiff's claim.  To accept Plaintiff's argument, the Court would have to ignore the extensive record of the administrative proceedings, the weight of the evidence presented in the administrative proceedings establishing that Danny would not benefit from attending core academic classes in the general setting, or that any benefits received while in the general education setting are "far outweighed by the benefits gained from services which could not feasibly be provided in the" categorical classroom.  Rocker, 700 F.2d at 1063.

All of the WBHS IEPT members that testified, stated that Danny needed to be in the categorical classroom to receive appropriate instruction in certain subjects.  The evidence presented in the administrative proceedings, by both Plaintiff's and Defendants' witnesses, established that Danny could not participate in regular education, take similar tests, or achieve at a level comparable to other ninth grade students.  Rather, Danny would have to work in isolation and be provided with a personal aide to present to him a separate first or second-grade level instructional program with materials that were completely different from those the regular ninth graders would be presented and would work on.  Danny's tenure at the JAMD does not prove otherwise.  Rabbi Bergman testified as to what classes comprise Danny's schedule.  And far from the assertion that Danny "is being successfully educated in general education courses and that his disabilities do not require his removal from the regular classroom for any amount of time," the testimony revealed that Danny has not taken a single core academic class while at the

20

5:04-cv-60047-MOB-VMM   Doc # 58   Filed 04/11/06   Pg 21 of 23   Pg ID 362

JAMD.  Pl.'s Post-Trial Brief, at pp. 11.  Rather, his schedule at the JAMD is similar to the

schedule mandated by the IEP, and calls for Danny to spend  half the day in general education

elective classes, while the other half is spent in directed study halls.  As noted above, directed

study halls are nothing more than study halls focused on a particular subject, where the students

present may be from many different classes within a subject area, working on individual

assignments with no class-wide instruction or participation, other than having specific questions

answered one-on-one by the study hall teacher.  This is far from being "fully included" in the

general education curriculum that Ms. Friedman sought from WBHS and is not evidence that

Danny's needs do not require his removal from the regular classroom for any amount of time.

Plaintiff's belief that full inclusion in core academic classes would be best able to

develop Danny's potential does not mean that it was the only FAPE that the School System

could offer under the IDEA, or the least restrictive environment that was appropriate for Danny's

needs.  Therefore, based on the administrative record and additional evidence presented to the

Court, and giving due deference to the determinations of the SRO's decision, the Court finds that

the preponderance of the evidence in this case supports the June 11, 2003, IEP placed Danny in

the general education setting to the maximum extent appropriate based on his needs. 20 U.S.C. §

1412(5)(B), see also Hudson By and Through Hudson v. Bloomfield Hills Pub. Schs., 910

F.Supp. 1291, 1304-05 (E.D. Mich. 1995).

### 3.      Plaintiff's Request for Reimbursement

Parents may receive retroactive reimbursement for private educational services
they unilaterally provide to their child in certain circumstances.  Sch. Comm. of
Burlington v. Dep't of Educ., 471 U.S. 359, 370, 105 S.Ct. 1996, 85 L.Ed.2d 385
(1985); Knable, 238 F.3d at 763.  Parents are entitled to such reimbursement if a
court concludes both that the public placement violated the IDEA and that the
private placement was proper under the IDEA.  Florence County Sch. Dist. Four

v. Carter ex rel. Carter, 510 U.S. 7, 15, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993);
Knable, 238 F.3d at 763.  A private placement is proper under the IDEA if the
education provided in the private placement is reasonably calculated to enable the
child to receive educational benefits.  Knable, 238 F.3d at 770 (citing Florence
County, 510 U.S. at 11, 114 S.Ct. 361).

Deal, 392 F.3d at 855.  Because the IEP did not violate the IDEA, Ms. Friedman is not entitled to

reimbursement for her expenditures enrolling Danny at the JAMD.

**IV.    CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED** that Counts I and II of Plaintiff's Complaint

are **DISMISSED.**


                                        s/Marianne O. Battani
                                        MARIANNE O. BATTANI
                                        UNITED STATES DISTRICT JUDGE



DATED: **April 11, 2006**




**CERTIFICATE OF SERVICE**

Copies of this Order were served upon  Myra Dutton-Johnson and Richard E. Kroopnick

on this date by ordinary mail and/or electronic filing.


                                        s/Bernadette M. Thebolt
                                        DEPUTY CLERK

22